**Alphonso WRIGHT and Sam Eugene Manous, Appellants,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F-73-199.**

Court of Criminal Appeals of Oklahoma.

Aug. 31, 1973.

Don Anderson, Public Defender, for appellants.

Larry Derryberry, Atty. Gen., Fred Anderson, Asst. Atty. Gen., for appellee.

BUSSEY, Judge.

Appellants, Alphonso Wright and Sam Eugene Manous, hereinafter referred to as Defendant Wright and Defendant Manous, were charged, tried, and convicted with co-defendant Raymond Harris, in the District Court of Oklahoma County, Case No. CRF–72–1404, for the offense of Rape in the First Degree; their punishment was fixed at 55 years imprisonment, and from said judgments and sentences, a timely appeal has been prefected to this Court.

At the trial, the prosecutrix, age 43, testified that she was employed as a High School teacher in the Oklahoma City area school system. On June 7, 1972, she and a friend, Paul Kirby, had dinner, finishing about 10:30 p. m. and went for a drive. They parked at a spot off the road near Interstate 35 and Wilshire, visiting and listening to the car radio. A black person, whom she identified in court as Defendant Wright, appeared by her car window, opened the door and jerked her from the car. Another black person ordered Kirby out of the car from the driver's side. Two other black persons appeared and the four persons dragged her off into a grassy area and raped her, first Defendant Wright, then Defendant Harris, and Defendant Manous, and a fourth unidentified subject. Her clothes were stripped off and her rings and bracelet were taken by Defendant Wright. They next "sort of scattered out, and then two of them came back and raped me again." (Tr. 9) She heard some gun shots and a car appeared. She was forced into the back seat and held on the rear floor, face down. When she attempted to look out of the car she was struck on the head. They stopped at a location near what she later learned to be 47th and Lenox. She was dragged from the car and raped again by each of the subjects. One of the subjects began "telling the others to come on, and I was much relieved when they did go on and left, and I heard the car roar off." (Tr. 10) She wiped the blood out of her eyes with some white garment and started walking to seek help. She reached a house where she was admitted, wrapped in a sheet, and the police were called. She was taken by ambulance to Mercy Hospital where she learned that her nose and right wrist were broken and her vagina torn. She identified State's Exhibit 1 as her bra she had been wearing.

Paul Kirby testified that he and the prosecutrix had dinner and drove to the area near Wilshire at approximately 11:00 p. m. He parked about a half a mile from Interstate 35 and they listened to the car

stereo. Suddenly from "both sides of the car a gun was stuck up to my temple," and he was ordered to get out of the car. As he was getting out someone started beating him over the head with a pistol or some blunt instrument. He could not see who was beating him or what was happening to the prosecutrix. When he regained consciousness he was nude and everyone was gone. He found the prosecutrix's brassiere and used it to wipe blood from his eyes. Near the rear of the car he found her white shorts and put them on because "That's all I could find." He flagged down a car and was taken to a filling station where he called the police. After talking to the police he went to the hospital where numerous stitches were taken in his scalp. He identified Exhibit 11 as his set of car keys, Exhibit 12 as his alligator money clip, Exhibit 13 as his notebook, Exhibit 14 as his card-carrying case, and Exhibit 15 as his watch, all items taken from him that night.

Gary James testified that he was a crime laboratory technician with the Oklahoma City Police Department and qualified in fingerprint identification. At approximately 1:20 a. m. on the 8th day of June, 1972, he went to the scene near Interstate 35 and Wilshire Blvd. He identified pictures of the Kirby car, of the prosecutrix's bra and sweater and lifted fringerprints from the car, one of which he was able to identify with a known print of Defendant Harris. He proceeded to the second crime scene at 43rd and Lenox and found two billfolds, one of which contained the social security card of Defendant Wright. He also found a car title registered to Defendant Harris and Charlene Jeffries.

Detective Hoover testified that on June 8, 1972, he placed the Defendant Harris under arrest and advised him of his constitutional rights. Defendant Harris signed a search waiver giving the police permission to search his residence. He found a bloody shirt in a garbage sack in the kitchen of Defendant Harris' residence.

Detective Summers testified that he obtained a search waiver from Defendant Harris for his 1965 Chevrolet automobile. He searched the car and found State's Exhibit 11, the car keys to the Kirby car, in the glove compartment.

Officer Burns testified that he interrogated Defendant Harris in the Oklahoma City Police Department on June 8, 1972, after advising him of his constitutional rights and ascertaining that he understood the same. Defendant Harris denied any knowledge of the incidents. Later that night Defendant Harris sent word that he wanted to tell them the truth. Defendant Harris stated that he and three other colored males were riding around in his car on the evening in question, drinking wine and smoking marijuana. As they were driving along Wilshire someone said: "Turn around and let's go down and check that car." (Tr. 146) He made a U-turn and three of the males got out of the car. They returned a short time later with a white woman. She was put in the backseat on the floorboard, and he was told to drive on. Harris then drank some whiskey and said he remembered nothing from that point forward. Burns identified a watch, State's Exhibit 15, which he found under a bush.

Officer Taylor testified that one June 9, 1972, he and other officers arrested Defendant Wright in the 10400 block of NE 46th Street at approximately 5:30 a. m. Upon seeing the police unit, Defendant Wright started running and threw away a .22 caliber pistol, which Taylor retrieved.

Officer Koonce testified that he participated in the arrest of Defendant Wright on June 9th. He identified State's Exhibit 12, the money clip which was found on this defendant's person.

Dr. Morris Curry testified that he was a gynecologist and obstetrician and examined the prosecutrix in the early morning hours of July 8, 1972, at Mercy Hospital. She had numerous facial abrasions and abrasions and contusions over the remainder of

her trunk and lower extremities. She had a laceration in the posterior part of her vagina. A smear was taken from her vagina which showed motile sperm present.

Officer Hoover testified that he interrogated Defendant Wright on June 9, 1972, after first advising him of his constitutional rights. Defendant Wright signed a right's waiver and made a written statement. Wright said that on the evening in question he and three other subjects bought some wine and drove around in the Chevrolet belonging to one of them. They noticed a parked car and stoppped about two blocks from it. Defendant Wright and another subject crawled back through the weeds to the car. His companion pulled a gun out of his belt and ordered the man and woman in the car to get out and began beating on the man. They forced the woman to get into their car. They went to a park near Northeast 43rd and Lenox and two of the subjects took the woman into the trees. He and the driver remained at the car. The other two returned from the woods and the four drove off leaving the woman. He found a money clip in the man and woman's car and kept it.

Officer Wells testified that on July 27, 1972, he arrested Defendant Manous, at which time Manous gave him a false name.

Officer Phelps testified that on the 9th day of June, 1972, he obtained a search warrant for the residence of Defendant Manous. He searched the residence and found a blood-stained shirt and trousers.

Harvey G. Hanna testified that on the 7th day of June, 1972, he observed Defendant Manous in Defendant Harris' car with two other persons he could not identify about 5:30 p. m. The following evening he had a conversation with Defendant Manous. He advised Manous that they had picked up Defendant Harris for Rape. Manous stated that he had to "get a float from here." (Tr. 237) Manous said: "The robbery, I was in it, but the rape I wasn't." (Tr. 238) Manous "hit the bush with something," which he later found out was the watch, Exhibit 15.

Defendant Manous testified that at 6:00 p. m. on June 7, 1972, he was at his mother's house in Okmulgee. He went to a drag race and stayed until approximately 11:00 o'clock p. m. He then picked up his mother and a friend at work and took them home. He then went to a beer tavern and stayed until approximately 1:30 a. m. He returned to his mother's house and went to sleep. He denied any knowledge of the rape and robbery, denied telling Harvey Hanna that he was involved, and denied giving Officer Wells a false name.

Wilma Manous testified she was defendant's mother and on June 7, 1972, he picked her up at her place of work in Okmulgee about 11:00 p. m. He took her and May Dawson home, and said that he would see her after awhile. The next morning he was there in bed.

Jessie Manous, defendant's father, testified that he was looking after defendant's house in Oklahoma City, and that it had been broken into several times.

Betty McVay testified that she was payroll clerk for Manpower, Inc. and her records showed that Defendant Wright worked for eight hours on June 7, 1972.

Defendant Wright testified that on June 7, 1972, he worked for Manpower, Inc. and got off work at 6:00 p. m. He took a taxicab and went to his father's house in Spencer, Oklahoma. He talked to his father for awhile and went to his stepmother's cafe to eat at approximately 8:00 o'clock. He picked up his brother, Frank Smith, and they went to Red's Cafe and shot pool. During the evening he drank wine, Scotch, smoked marijuana and took some barbiturates. They left Red's Cafe at approximately 3:00 a. m. and returned to his brother's house where he stayed until "close to morning." The following day he found a pistol which had been hidden by a man outside Red's Cafe. His aunt agreed to take him back to Oklahoma City and on the way were stopped by the police. He testified that the police beat him severely and that because of the beatings and the drugs and drinking he did not remember

giving any statement to Officer Hoover. He denied any participation in the rape or robbery and denied being with either of the co-defendants on the evening in question. He testified that the money clip, State's Exhibit 12, was his property. On cross-examination he denied making any statement to Detective Burns after his arrest.

Maurice Wright, age 14, testified that he saw Defendant Wright in Spencer at approximately noon on June 7, 1972.

Frank Smith, Defendant Wright's stepbrother, testified that Defendant Wright came to his house on June 7th at about 9:00 p. m. They went to Red Muke's cafe and stayed for three or four hours. Defendant Wright returned home with him and remained there until approximately 4:30 a. m.

In rebuttal, Detective Burns, testified that Defendant Wright had furnished him information in the past concerning narcotic investigations; that on June 9, 1972, he observed Defendant Wright on the third floor of the city jail as he was brought in to be booked. Defendant Wright stated that he wanted to talk to him. After being given the *Miranda* warning, defendant admitted his participation in the rape and implicated Defendant Manous. Defendant Wright also gave him information about where incriminating articles of clothing might be found. Burns also testified that when he interrogated Defendant Harris, the latter told him that Defendant Manous was involved in the crime.

Bennie Jones, testified that Defendant Manous had asked him to testify that he had seen him at the drag racetrack in Okmulgee on the evening in question; that he was going to testify for Defendant Manous, but changed his mind when he was advised of the penalty for perjury.

■■■■■ The first proposition asserts that the verdict is not supported by the evidence. We have consistently held that where there is competent evidence in the record from which the jury could reasonably conclude that the defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and determine the facts. Turner v. State, Okl.Cr., 479 P.2d 631.

■■■■■ The second proposition contends that the punishment is excessive. Suffice it to say from the foregoing statement of facts, the punishment imposed does not shock the conscience of this Court. Defendant Manous further argues that accusatory hearsay was admitted against him. Officer Burns testified in rebuttal that during his interrogation of Defendant Harris, Harris said that Defendant Manous was one of the four Negroes involved in the crime. Defendant Manous argues that since Harris did not testify and was not subject to cross-examination by his attorney, he was denied the right of confrontation by his accuser, Harris. In dealing with a similar proposition in the recent case of Justice v. State, Okl.Cr., 512 P.2d 1389 we stated:

"Defendant cites as authority Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, wherein the United States Supreme Court held that it was prejudicial error to admit a co-defendant's confession that implicated defendant at a joint trial, even though the trial court gave instructions that confession could only be used against co-defendant.

Although we are of the opinion that the trial court should have granted a severance, but because of the overwhelming evidence of defendant's guilt that the same does not constitute fundamental error. In Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340, the court stated:

'Having concluded that petitioner's confession was considered by the jury, we must determine on the basis of "our own reading of the record and on

what seems to us to have been the probable impact . . . on the minds of an average jury," Harrington v. California, supra, 395 U.S. 250 at 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 at 288, whether Snell's admissions were sufficiently prejudicial to petitioner so as to require reversal. In Bruton, the Court pointed out that "[a] defendant is entitled to a fair trial but not a perfect one." 391 U.S. at 135, 88 S.Ct. 1620, 20 L.Ed.2d at 484, quoting Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593, 604 (1935). Thus, unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705, 710, 24 ALR3d 1065 (1967). In this case we conclude that the "minds of the average jury" would not have found the State's case significantly less persuasive had the testimony as to Snell's admission been excluded. The admission into evidence of these statements, therefore, was at most harmless error.' "

As in *Justice*, supra, we are of the opinion that the "minds of the average jury" would not have found the State's case "significantly less persuasive" had the testimony as to co-defendant Harris' admission been excluded. The prosecutrix positively identified Defendant Manous as being one of the perpetrators of the dastardly acts; Harvey Hanna testified that he saw Defendant Harris and Defendant Manous on the evening in question, about 5:30 p. m. in Harris' car with two other persons. The following evening when he informed Defendant Manous that they had picked up Defendant Harris for Rape, Manous stated that he had to get out of town because he was involved in the robbery, but not in the rape. We observe that Manous "hit the bush with something" which was later retrieved by Detective Burns, and identified as being Paul Kirby's watch. Officer Phelps testified that he searched Defendant Manous' residence and found a bloodstained shirt and trousers.

The judgments and sentences are accordingly affirmed.

BLISS, P. J., and BRETT, J., concur.